**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| |
|---|
| VIKRAM P. GROVER, d/b/a IX Advisors a/k/a IXA, |
| |
| *Plaintiff,* |
| |
| v. |
| |
| NET SAVINGS LINK, INC., a Colorado corporation formerly organized as a Nevada corporation, WILTON GROUP, LIMITED, as registered in the Isle of Man, U.K., WILTON UK (GROUP) LIMITED, as registered in England and Wales, U.K., CHINA FOOD AND BEVERAGE CO., a Colorado corporation, and JAMES A. TILTON, |
| |
| *Defendants.* |

Case No. 21-cv-5054

Judge Mary M. Rowland

## TEMPORARY RECEIVER'S INITIAL REPORT

David A. Castleman
Philip C. Berg
Varinder P. Singh
OTTERBOURG P.C.
230 Park Avenue
30th Floor
New York, New York 10169
(212) 661-9100
dcastleman@otterbourg.com

*Temporary Receiver*

David A. Castleman, as the court-appointed temporary receiver (the "Temporary Receiver") of Net Savings Link, Inc. ("NSAV" or "Company") pursuant to a receivership order (the "Receivership Order") [226][1] entered by this Court in this action on September 27, 2024 following a $64 million default judgment entered against NSAV (the "Grover Judgment"), files this initial written report (the "Initial Report") to apprise the Court of the actions he has taken with respect to NSAV, what assets he has discovered, any steps he may have taken to secure or protect such assets, and recommendations for next steps. The conclusions and recommendations in this Initial Report are preliminary and subject to change if additional facts come to light. Although Defendant James A. Tilton was generally cooperative with the Temporary Receiver and provided information upon request, the Temporary Receiver's conclusions reflect the limited information available to him during the course of his appointment and the limited resources of the Company to fund a receivership.

## I.  INTRODUCTION

In the limited time frame since his appointment, the Temporary Receiver has undertaken a preliminary evaluation of NSAV's operations, financial condition, and purported assets. The Temporary Receiver's primary review has focused on the NSAV's Second Quarter 2024 "Amended Quarterly Report," filed on October 2, 2024 (the "Q2 Report") by James Tilton and certified by Mr. Tilton as the principal executive and financial officer of NSAV.[2] NSAV is a publicly traded company, trading on the over-the-counter exchange operated by OTC Markets

---

[1] Such bracketed numbers refer to the docket entries in this action.

[2] The original Q2 Report was filed in August 2024, before the Temporary Receiver was appointed. The amended Q2 Report was filed by Tilton without the advance knowledge or permission of the Temporary Receiver, and appended a single page of detail concerning the $11 billion in income reported by NSAV in the original and amended Q2 Report. The Temporary Receiver has since been in contact with OTC Markets and understands that no further filings on OTC Markets will be permitted until further notice. A copy of the amended Q2 Report is attached hereto as Exhibit 1. A copy of the general ledger provided to the Temporary Receiver is attached hereto as Exhibit 2.

Group Inc. ("OTC Markets"), with an average volume of 20 million shares per day in just the past month alone.[3] The closing price as of October 30, 2024 (the day before the filing of this Initial Report) was $0.002 per share, for a total market capitalization of around $15 million.

The Q2 Report reports $11 billion in net income, largely based upon purported revenue earned from various cryptocurrency development and incubation activities, and all of which is based upon the valuation of certain illiquid and untradeable cryptocurrency tokens. The Q2 Report also lists $1.2 million in current assets and $85.4 million in non-current assets. The Temporary Receiver has been informed by current management that the only potentially productive asset is the investment in a cryptocurrency exchange (the "AWH Exchange") operated by Active World Holdings, Inc. ("AWH"), a company that is currently seeking protection under Subchapter V of Chapter 11 of the U.S. Bankruptcy Code in the Eastern District of Pennsylvania.[4] The Temporary Receiver has consulted with the Plaintiff, a former insider of AWH, an independent SEC-registered cryptocurrency investment adviser that specializes in this field, and the current principal of AWH. In addition to his personal review, the common conclusion is that the $11 billion valuation is not based upon any actual market, and—with the exception of the AWH principal—all have indicated that the tokens themselves have red flags suggesting the possibility of fraud.[5] Based upon the information provided to the Temporary Receiver, neither the investment in the AWH Exchange nor the tokens themselves have any ascertainable value above zero or any ability to satisfy or fund the Grover Judgment, or to fund the operations of NSAV.

---

[3] *See* https://www.otcmarkets.com/stock/NSAV/overview; https://finance.yahoo.com/quote/NSAV/.

[4] *In re Active World Holdings, Inc.*, Case No. 24-12780 (Bankr. E.D. Pa.).

[5] Whether the tokens themselves were fraudulently issued, or will eventually have any value whatsoever, is beyond the scope of this Initial Report.

The remaining current assets, totaling around $84 million, also appear to be illusory. The vast majority of those assets appear to be investments that NSAV made in partnership with Silverbear Capital Inc. ("Silverbear"). Documents provided to the Temporary Receiver by Tilton indicate that the investments were generally made using vague one-two page contracts, which called for the issuance of a convertible note and a small amount of cash and freely tradeable NSAV shares to make such investment. The investment would often be accompanied by the filing of a press release—which Tilton advised the Temporary Receiver was his specialty and primary function—that would on occasion also precede a spike in the NSAV stock price. But none of the investments appear to have provided any value to NSAV, and NSAV does not appear to have a verified interest in any actual underlying company (if the such company does, in fact, exist). Indeed, it appears that one such announcement was correlated with the increase in the NSAV stock price that resulted in the calculation of the amount of the Grover Judgment. In any event, none of these assets appear to have any ability to assist in the satisfaction of the Grover Judgment, or even in funding the operations of NSAV.

The only verifiable asset that the Temporary Receiver has been able to find is $43 in an NSAV business checking account. Both Mr. Tilton and Alfonso Knoll—the principal of AWH who resigned as CEO of NSAV on September 26, 2024 (the day before the Temporary Receiver was appointed, but after a hearing for such was scheduled)—have requested that NSAV fund various activities including purported development costs of the AWH Exchange by selling substantial numbers of NSAV shares. The most recent request was for over 66 million shares— three times the average daily trading volume—in order to pay ordinary course expenses. The Temporary Receiver has not approved the issuance of any additional shares, and has informed

NSAV's transfer agent, the Pacific Stock Transfer Company ("Pacific"), that he has not authorized any such issuance.

In addition to the Grover Judgment, NSAV faces significant liabilities with no ability to fund its operations or those liabilities. Proposed Intervenor WFD Capital ("WFD"), claims a lien on the $2.5 million note owing to AWH based upon NSAV's investment in AWH Exchange (made with a note and not any actual funds). Another company, Quick Capital LLC ("Quick Capital"), informed the Temporary Receiver of a default judgment it obtained in Miami-Dade County requiring the delivery of 159,551,735.38 common NSAV shares, and that such court issued an injunction prohibiting the issuance of new shares ahead of Quick Capital. The Temporary Receiver has complied with that injunction to the extent that he has not authorized any additional common shares of NSAV to be issued.[6]

Based upon his review of NSAV's financial information and course of conduct, as set forth herein, the Temporary Receiver has not identified any asset of NSAV that it could use to satisfy the Grover Judgment or any other of its liabilities or operations. The only access to capital for NSAV appears to be the issuance and sale of shares on the public market, but the financial information in the Q2 Report is so unreliable and potentially fictitious that any issuance of shares would create a substantial risk of violations of federal and state securities laws.[7] Although suspending current trading in NSAV is outside the authority of the Temporary Receiver, he will serve a copy of this publicly filed Initial Report on OTC Markets, Pacific, and the Securities and Exchange Commission ("SEC").

---

[6] A copy of the judgment is attached hereto as Exhibit 3.

[7] Whether any of the prior acts of NSAV, Tilton, Silverbear, or others constitute securities fraud or other violations of the securities laws of any jurisdiction, is beyond the scope of this Initial Report.

Given the lack of resources of NSAV to fund even basic operations—let alone a receivership or even potential litigation claims against AWH, Silverbear, or other counterparties— the Temporary Receiver further recommends that his appointment not be made permanent at this time. Moreover, as NSAV has no foreseeable ability to fund liabilities or future operations, the Temporary Receiver recommends—subject to the views of the Parties to this Action—NSAV file a Chapter 7 Bankruptcy, which will allow a court-appointed trustee to wind down NSAV in an orderly manner under the provisions the Bankruptcy Code. The Grover Judgment, any other liabilities, and any fee application approved for the Temporary Receiver would all be unsecured liabilities in such bankruptcy proceeding.

## II.     PROCEDURAL HISTORY

On September 23, 2021, Plaintiff Vikram Grover ("Grover") sued Defendants NSAV, Wilton Group, Limited ("Wilton"), Wilton UK (Group) Limited ("Wilton UK"), China Food and Beverage Co. ("CHIF") (collectively, the "Corporate Defendants"), and James Tilton. On September 5, 2024, judgment against NSAV, Wilton, Wilton UK and CHIF in the amount of $64,685,627.57 was entered, and judgment against Tilton in the amount of $57,903,750.00 plus pre–judgment interest was entered. [218].

Grover moved for the appointment of a receiver, styled as a request for the appointment of a Chief Restructuring Officer. [177]. On September 11, 2024, the parties filed a joint status report stating that they were in settlement discussions and requesting an extension to September 13 on the appointment of a receiver. [219]. On September 12, the Court entered a minute order requiring the parties file a further status report on September 13. [220]. After no report was filed, the Court reiterated its order on September 23, and a joint status report was filed that no settlement or agreement on the appointment of a receiver had been reached. [221, 222].

6

On September 27, 2024, based on the various submissions of the parties to date, and the hearing before the Court on September 27, the Court found that (i) there is a significant sum due to Plaintiff as a creditor, (ii) there is an imminent danger that the property of NSAV will be concealed, lost, diminished in value, or removed from the jurisdiction of the Court; (iii) there is no other remedy that is practical under the circumstances; and (iv) the appointment of a temporary receiver is appropriate and necessary to assess, preserve, and manage of the assets of NSAV in light of the Grover Judgment entered.

That same day, the Court entered the Receivership Order. [226] Paragraph 9 of the Receivership Order required the Temporary Receiver to file with the Court a written report consisting of the actions he has taken with respect to NSAV, what assets he has discovered, any steps he may have taken to secure or protect such assets, and recommendations for next steps. The Court extended the due date for this Initial Report to October 31, 2024. [231] This Initial Report is submitted in compliance with the Receivership Order to inform the Court of the status of the Temporary Receiver's investigation and activities in this matter since the Temporary Receiver's appointment.

## III. TEMPORARY RECEIVER'S INVESTIGATION

Since his appointment, the Temporary Receiver has undertaken a preliminary investigation into the operations of NSAV to preserve, maintain, and manage the receivership estate, while also determining the true financial condition of the company. The primary objectives were to locate and secure assets for the receivership estate, compile essential data to maintain the estate, determine the value of the estate, trace cash and cryptocurrency transactions to assess any potential claims, and identify any viable claims against third parties that could benefit the estate.

This Initial Report reflects the Temporary Receiver's analysis of NSAV's financial data and records, tax returns (through 2017—the Temporary Receiver understands that no such returns

exist from 2018 onward), the litigation docket, public sources, and other documents. Tilton provided the Temporary Receiver with a number of documents relating to the operation of NSAV, including the various deals and press releases related to the investments NSAV made with Silverbear, prior to its association with AWH. A list of the documents provided to the Temporary Receiver is appended to this Initial Report.

The Temporary Receiver also conducted interviews with a number of relevant individuals, including Tilton and Grover. The Temporary Receiver also consulted with Knoll, Trey Whitfield (NSAV's current accountant, per the Q2 Report), former AWH employees, NSAV investors, OTC Markets, Pacific, a representative of WFD, and counsel to Quick Capital. Representatives of Silverbear did not respond to the Temporary Receiver's request for information, and Michael Osborn of AWH similarly did not respond to the Temporary Receiver (Knoll responded on his behalf).

The Temporary Receiver also consulted with a number of financial and investigative experts—none of whom were officially engaged given the lack of funds in NSAV to fund an investigation—to provide insight and analysis into NSAV's cryptocurrency assets and the potential for litigation against Silverbear. The Temporary Receiver also filed Section 754 notices in the following United States District Courts: Colorado, Wyoming, New York Eastern, Pennsylvania Middle, and Miami Southern.

In addition to his investigation, the Temporary Receiver received a number of requests from Tilton and Knoll to approve the issuance of new shares to fund existing operational expenses. The Temporary Receiver did not approve such requests, as set forth herein. There are no other operational activities of NSAV of which the Temporary Receiver is aware, and Tilton has even described NSAV as a "shell."

## IV. PRELIMINARY ANALYSIS OF THE NSAV ASSETS

The Temporary Receiver's initial investigation into NSAV's assets was primarily based on a review of available financial records and information gathered. For the reasons set forth herein, the Temporary Receiver is concerned that the asset values reported in the Q2 Report do not have any substantive support and appear to be likely inaccurate. Whitfield represented to the Temporary Receiver that he was not provided with any comprehensive records or historical data to prepare the Q2 Report, but relied on various emails sent by Tilton, containing invoices, promissory notes, bank statements, and other financial documents relevant to the quarter. After reviewing the documents provided by Whitfield, the Temporary Receiver could not adequately substantiate the reported asset values, nor could Tilton. The following section provides an analysis of the major assets identified in NSAV's financial reports given these limitations, incorporating findings from both publicly available data and information gathered through informal interviews.

### A. Cryptocurrency Holdings

With respect to NSAV's cryptocurrency holdings, the Temporary Receiver's primary objective was to understand the basis of NSAV's reported $11.75 billion valuation attributed to its cryptocurrency holdings, as listed in the Q2 Report. According to the Q2 Report, NSAV claimed to have received various cryptocurrency assets as payment for services rendered. Tilton, Whitfield and Knoll all indicated that the value of these assets came from AWH and either Knoll or Osborn. When pressed on the valuation, Knoll was unable to provide any substantiation for the value, and acknowledged that the exchange was merely an "incubator" for speculative tokens. Knoll did provide online whitepapers for the tokens, but none of those indicated that there was any actual value. Moreover, a former insider of AWH and associate of Knoll reached out to the Temporary Receiver and indicated that the tokens did not have value.

To further assess the AWH tokens and exchange, the Temporary Receiver engaged a reputable cryptocurrency investment advisory firm (the "Investment Advisor"), to independently evaluate NSAV's cryptocurrency portfolio. The Investment Advisor's found no verifiable value in the reported cryptocurrency assets, nor any activity suggesting active market demand or intrinsic worth. The Investment Advisor also checked NSAV's cryptocurrency holdings against TRM Labs, a monitoring tool for major blockchains. None of the applicable blockchains (Zeus, DaVinciPay, NSAV, or AWC) appear on TRM Labs.

Further, AWH is run on a known blockchain named HollaEx, an exchange based in St. Vincent and the Grenadines. The Investment Advisor found that this exchange demonstrated low trading volume, with fewer than 4,000 transactions and total amounts under $10 million, casting doubt on its credibility. Additionally, potential sanctions issues related to HollaEx were noted, though a full investigation into HollaEx is beyond the scope of this Initial Report.

As such, the Temporary Receiver's investigation, corroborated by a former AWH insider and a well-respected Investment Advisor, has found no basis to support NSAV's and AWH's reported over $11 billion valuation of its cryptocurrency holdings. There is no credible evidence or rationale for attributing any meaningful value to these assets.

**B.    AWH Exchange**

The Q2 Report lists an investment in AWH with a stated value of $2,500,000, which is related to the exchange itself that was rebranded as NSAVx. The original agreement between NSAV and AWH, signed on October 14, 2022, stipulated that NSAV would acquire a 100% interest in AWC Exchange Inc., which operates the website www.awcexchange.com, in exchange for preferred shares and a payment of $250,000. NSAV also agreed to pay an additional $50,000 monthly consulting fee to AWH, based upon a consulting agreement that was to be agreed to at a

later date, but which Knoll confirms does not exist. A promissory note issued to AWH by NSAV specified a principal sum bearing 6% interest per annum, with full payment due on November 14, 2022. However, on January 24, 2023, Knoll, the CEO of both AWH and, until recently, NSAV, rescinded the agreement due to NSAV's failure to make a scheduled payment.

Subsequent modifications to the agreement followed. In March 2023, NSAV and AWH restructured the deal as a joint venture for the development and operation of the AWC Exchange, with NSAV agreeing to invest $250,000 via a promissory note while cancelling the original $2,500,000 promissory note. By November 2023, however, the agreement was again amended, effectively reinstating the December 2022 acquisition terms, this time with a one-year, convertible secured promissory note bearing an 8% interest rate.

After the Receivership Order was entered, Knoll maintained communication with the Temporary Receiver, providing some, but not all, requested documents. According to Knoll, NSAV continues to owe $50,000 per month in operating fees to AWH, which allegedly outsources the AWC Exchange's operations to a blockchain development firm. However, Knoll recently informed the Temporary Receiver that AWH has been unable to raise funds to cover these expenses, placing the exchange at risk of shutdown.

The financial stability of AWH itself is also questionable. On August 8, 2024, AWH filed for Subchapter V bankruptcy in the Eastern District of Pennsylvania, with Knoll listed as holding 100% ownership.[8] AWH's bankruptcy filings disclose that no federal income tax returns, balance sheets, or financial statements have been prepared, which raises further concerns regarding its operational viability. In its bankruptcy schedules, AWH claims NSAV owes a $2,500,000 convertible note that matured in February 2024, as well as $500,000 in unpaid monthly exchange

---

[8] *In re Active World Holdings, Inc.*, Case No. 24-12780, Dkt. No. 17 (Bankr. E.D. Pa. filed Aug. 27, 2024).

operating fees (including fees purportedly owed under a consulting agreement), which accrue at $50,000 per month. After the Temporary Receiver requested that AWH provide the applicable consulting agreement, AWH disclosed that none exists.

Critically, as stated above, the Investment Advisor has been unable to find any evidence that the AWH Exchange is tracked on TRM Labs, generates any actual revenue, or has the potential to generate any actual revenue for NSAV. The tokens that are traded on the AWH Exchange do not appear to have any actual value as set forth above. Nothing provided to the Temporary Receiver by either Tilton or Knoll demonstrates any actual value for the AWH Exchange. Given the foregoing, the Temporary Receiver has found no evidence to support NSAV's $2,500,000 valuation of its investment in AWH Exchange, which appears to be based solely on the value of the AWH Note—itself convertible to NSAV shares. The lack of value in the AWH Exchange could potentially serve as a defense to the payment of the AWH Note, as set forth below.

### C.    Noncurrent Assets

In addition to the AWH exchange, NSAV's 2Q report listed twelve non-current assets, with a reported total value of $82,914,560. These assets, largely facilitated by Silverbear through its purported investment arm TG Private Equity Inc., reflect investments made over several years. Under a consulting agreement initiated in February 2021, TG Private Equity received 30 million shares of NSAV's restricted Series A Preferred Stock as compensation.

At the Temporary Receiver's request, a reputable investigative firm conducted an initial review of Silverbear. Silverbear describes itself as a consulting and investment banking firm focused on mainland China and Southeast Asia, allegedly headquartered in Seychelles. However, no registration record exists for Silverbear in the Seychelles Business Register. The investigative firm indicated that there were serious doubts as to the legitimacy of Silverbear, as well as its ability

12

to satisfy any sort of litigation judgment, although a full analysis of Silverbear and any potential claims against it is beyond the scope of this Initial Report.

The Silverbear investments were generally documented with a bare bones one-two page investment agreement, under which NSAV would provide a nominal amount of cash, potentially some unrestricted shares, and a substantial amount of Series B Preferred Shares, to Silverbear or TG Private Equity, and Silverbear would facilitate the investment. There is no indication that any interest in any of the underlying companies—to the extent that they exist—was ever perfected or made. The Temporary Receiver's preliminary findings with respect to each investment is as follows:

1.     Intangible Asset

On November 29, 2021, NSAV entered into a Digital Blockchain Native Token Agreement with TG Private Equity to facilitate the creation of the NSBC token on the OKEX Chain (whose relationship to the more common OKX Chain is not clear). As part of this agreement, NSAV paid $70,000 in cash and issued $7,000,000 in preferred Class B shares to TG Private Equity. In return, NSAV was allocated 50% of the founder's token pool, representing 5% of the total NSBC token supply, equating to 50,000,000 tokens. As of December 31, 2021, these tokens were assigned an internal valuation of $0.10 each, resulting in the $5,000,000 asset valuation reported by NSAV.

Despite this initial valuation, the Temporary Receiver has found no evidence to suggest that NSBC has accrued any market value or achieved notable trading volume on any exchanges. While the NSBC token is listed on the centralized crypto exchange called VAEX, it does not exhibit active trading, nor is there any indication of liquidity or demand. This lack of market activity undermines the viability of the $5,000,000 valuation NSAV attributed to NSBC.

2. <u>DEX Exchange</u>

On the NSAV 2Q Report, DEX Exchange is valued at $15,080,000. On November 5, 2021, NSAV entered into an agreement with TG Private Equity to develop a decentralized exchange (DEX) on the OKEX Chain. NSAV issued $7,000,000 in preferred Class B shares and paid $80,000 in cash for this service. A second agreement on December 1, 2021, added another DEX on the Binance Blockchain, with NSAV issuing an additional $8,000,000 in shares. The Temporary Receiver has not received sufficient documentation to verify the existence, functionality, or value of these DEX platforms. Without evidence of active operations or revenue, the claimed valuation appears unsubstantiated.

3. <u>Trading Desk/ Super Chain Capital</u>

On August 5, 2021, NSAV entered into a definitive agreement with TG Private Equity to acquire a 40% stake in Super Chain Capital Ltd. ("<u>Super Chain</u>"), a company incorporated under the laws of Hong Kong, owns and operates an OTC cryptocurrency trading desk. According to Tilton, this deal had two parts.

The initial part of the agreement TG Private Equity involved facilitating the creation of an OTC cryptocurrency trading desk for NSAV, as referenced on the NSAV website. Although the website remains active, there is no indication that the trading desk has ever conducted any crypto trades. The second part of the deal entailed NSAV acquiring a 40% stake in Super Chain's cryptocurrency trading desk, formerly accessible at www.HKOTC.co (now inactive). For both deals, NSAV agreed to pay $30,000 in cash and issue $8,000,000 in restricted Series B Preferred Shares to TG Private Equity's designee as compensation for facilitating both the OTC trading desk and the Super Chain stake transfer. On the Q2 Report, the OTC trading desk is valued at $8,000,000, and Super Chain is valued at $30,000.

Despite these arrangements, the Temporary Receiver found no evidence that the OTC trading desk or the Super Chain trading desk generated any revenue for NSAV. Furthermore, Tilton confirmed that NSAV has never received any income from the trading desk and that the desk is no longer operational. Nonetheless, the NSAV balance sheet lists this investment at $30,000, a valuation unsupported by documentation. The Temporary Receiver's inquiries yielded no subscription agreements, share entries, or other proof of NSAV's 40% ownership in Super Chain, casting doubt on the validity and value of this investment.

4.    Cryptocurrency

On January 27, 2022, NSAV entered into an agreement with TG Private Equity to acquire a 10% stake in Metaverse Network LLC ("MNC"), which owns BQEX Ltd., a cryptocurrency exchange with reportedly over 4 million registered users. NSAV paid $100,000 in cash, $25,000,000 in restricted Series B Preferred Shares, and $200,000 in unrestricted common stock for this stake. However, the Temporary Receiver has not received any documentation from TG Private Equity or Tilton to substantiate the value of this investment.

Additionally, on February 25, 2022, NSAV entered into a Digital Blockchain Mining Agreement with TG Private Equity for a 10% interest in the HIVE Cryptocurrency Mining project. NSAV paid $40,000 in cash and issued $5,000,000 in preferred B shares as consideration. As with the BQEX investment, no documentation has been provided to verify the current status or value of this mining project. Given the lack of supporting documents and the Temporary Receiver's inability to confirm any operational or financial activity, the claimed values for these investments remain unsubstantiated.

5. <u>Blockchain</u>

On the Q2 Report, the non-current asset labeled "Blockchain" is valued at $12,415,000. This asset is comprised of the following deals:

On January 17, 2022, NSAV entered into a Digital Blockchain Token agreement with TG Private Equity to create a blockchain NFT token named MNC. NSAV agreed to pay $35,000 in cash and issue $7,000,000 in preferred Class B shares for this project. No documentation has been provided to confirm the creation or value of this token.:

On February 26, 2022, NSAV entered into a Jinbao Digital Blockchain NFT Agreement with TG Private Equity to create a Jinbao blockchain NFT token, agreeing to pay $100,000 in cash and issue $1,000,000 in preferred B shares, plus $200,000 in common stock.

On April 26, 2022, NSAV entered into a Digital Blockchain Mobile Mining Agreement for a 10% interest in the Hive Mobile Mining Project, paying $80,000 in cash and issuing $4,000,000 in preferred B shares.

As of this Initial Report, the Temporary Receiver has not received any documentation from TG Private Equity or NSAV's management to verify the value, operational status, or revenue generation of these digital assets and NFT projects. Without supporting evidence, these investments' reported values remain unsubstantiated.

6. <u>Protocol</u>

On January 17, 2022, NSAV entered into a Blockchain Protocol Venture agreement with TG Private Equity to form a joint venture with the Vagabond protocol. NSAV agreed to issue $1,000,000 in preferred Class B shares as consideration. On the same day, NSAV signed an agreement to acquire a 50% stake in Vagabond Technology Solutions, LLC, with the goal of

jointly developing and marketing Vagabond's blockchain protocol. The purchase price was set at $1,000,000 in restricted Series B Preferred Shares.

On the Q2 Report, the value of this asset is $1,000,000. The Temporary Receiver has received very limited documentation related to this transaction, and there is minimal evidence to confirm the operational status or potential value of this joint venture or the Vagabond protocol stake. Given the lack of substantiating documents, the reported valuation remains questionable.

7.   <u>Awallet</u>

On April 18, 2022, NSAV entered into a Digital Wallet and ACOIN distribution agreement with TG Private Equity, acquiring a 10% interest in Awallet. As consideration, NSAV agreed to pay $130,000 in cash, issue $8,000,000 in preferred B shares, $200,000 in common stock, and an additional $20,000 cash by July 1, 2022.  On the Q2 Report, the value of Awallet is $8,350,000. However, limited documentation has been provided to verify the value or functionality of Awallet, leaving the reported valuation unsubstantiated.

8.   <u>Goodwill</u>

The Q2 Report includes certain transactions categorized as goodwill. According to the Q2 Report, on March 6, 2021, NSAV entered a Digital Blockchain Token Company Acquisition Agreement with TG Private Equity to create SBCDF Investment Inc., a "Token Company." TG Private Equity was expected to launch a token, STUX (SBC Token Unix X), in the third quarter of 2021. In exchange, NSAV issued 500 million Series B convertible preferred shares to TG Private Equity, recording goodwill of $17,450,000 based on a share value of approximately 3.5 cents.

However, on May 6, 2022, TG Private Equity returned the 500 million Series B shares to NSAV, reversing the $17,450,000 goodwill initially recorded. Although NSAV retained an option

to acquire an additional 25% stake in SBCDF, the STUX token has yet to launch, and there is no indication it will be issued in the future.

Additionally, on November 29, 2021, NSAV entered into a separate Digital Blockchain Native Token Agreement with TG Private Equity to create an NSAV Native Token, NSBC, on the OKEX chain. This transaction purportedly added goodwill of $2,070,000 to NSAV's balance sheet, although it is not clear that there is any remaining premium that should continue to be recorded as goodwill on the NSAV balance sheet.

**D.**     <u>**Other Assets**</u>

    1.     <u>Investment in Subsidiary</u>

In 2017, NSAV reported acquiring a 70% stake in Shanghai Hua Si Tai Medical Consultation Company Limited ("<u>Shanghai Hua</u>"), a Chinese medical research firm, valued at $400,000 through a non-convertible promissory note. The Q2 Report adjusted the investment's value to $410,000, claiming that Shanghai Hua held a subsidiary, Vital Strategic Research Institute, with partnerships with major pharmaceutical firms. However, the Temporary Receiver found no evidence of revenue, operations, or real value tied to Shanghai Hua or its subsidiary.

The Temporary Receiver's efforts to confirm any partnerships or financial activity of Shanghai Hua were unsuccessful. Other than the general agreement, no contracts, project records, or revenue statements were provided, and public sources show no significant activities for these entities. The lack of transparency and income verification raises doubts about NSAV's $410,000 valuation for this asset.

    2.     <u>Cash</u>

The Temporary Receiver's investigation revealed that NSAV maintains a single business account at Citizens Bank in New York. The August statement shows a balance of $42.79, and

statements reviewed by the Temporary Receiver indicate that the account balance has generally remained below $100 for most of 2024. The highest reviewed balance was $33,914.80 in August 2023. No additional bank accounts have been identified by the Temporary Receiver.

### 3. Equity Interest

The Q2 Report lists an equity interest valued at $1,000,000. However, the documents that the Temporary Receiver reviewed do not clarify what this equity interest represents. Tilton and Whitfield were also unable to provide evidence supporting the valuation. Tilton suggested that the stated value might relate to Tiger Brands, Inc., a company mentioned in the Q2 Report, which Tilton allegedly created for NSAV to acquire. According to Tilton, Tiger Brands is now defunct, making the stated value of the equity interest inaccurate. The Q2 Report also lists shares issuance receivable and accounts receivable as assets, yet Tilton was unable to identify the underlying assets associated with these entries.

### 4. Litigation Claims

NSAV may be able to pursue successfully litigation claims against certain parties, most notably Silverbear and TG Private Equity, related to fraud or other claims arising from the failure to deliver investments as promised. The Temporary Receiver consulted with a preeminent investigative firm to assist (without charge) in determining whether Silverbear, TG Private Equity, or Silverbear's principal would be effective targets that could satisfy a judgment even if obtained. Such results were not promising, and NSAV does not have any assets to fund such litigation. Moreover, while the Temporary Receiver considered the concept of litigation funding, without an identified defendant with the ability to satisfy a judgment, the likelihood of securing such funding is likely remote. Although NSAV does not appear to have the resources to pursue any such claims,

the Temporary Receiver notes that such claims would pass to the estate and could be pursued by a Chapter 7 Trustee, if NSAV were file for bankruptcy.

## V.     PRELIMINARY ANALYSIS OF LIABILITIES, EQUITY AND SOLVENCY

### A.     AWH and Other Operational Expenses

Knoll assembled and sent, through Tilton, the Temporary Receiver a list or current expenses with a request for the issuance and sale of NSAV common stock to pay such expenses. The requested expenses totaled $72,916 and consisted primarily of legal expenses ($30,000), AWH Consulting Expenses ($25,000), Programming Labor ($10,000), HollaEx hosting expenses for the AWH Exchange ($5,500), and miscellaneous tech-related expenses of AWH ($2,416 total).

Knoll advised the Temporary Receiver that AWH had paid for such expenses in the past but was unwilling to do so going forward. The Temporary Receiver understands that, prior to the Receivership Order, NSAV reportedly covered its expenses by issuing additional shares, or by issuing convertible promissory notes to willing lenders that would likely be converted to shares (as with Quick Capital). The Temporary Receiver advised Tilton and Knoll that he was not authorizing the issuance of new NSAV shares. There are no operations or investments in NSAV that would generate the funds necessary to pay the requested expenses.

### B.     AWH Note and Other Convertible Notes

Next month, the interest on the AWH Note for the purchase of the AWH Exchange comes due, requiring the payment of $200,000 in interest, or the note may be converted to equity. The Temporary Receiver remains concerned about the issuance of any new shares of NSAV given the issues with the financial statements as set forth above. Further, given that the value of the AWH Exchange—which was purchased by NSAV using the AWH Note—cannot be verified and that there is a substantial chance that such value is close to or equal to zero, NSAV may have defenses

to performance on the note. Indeed, NSAV may be able to successfully argue that the AWH Note was obtained by fraud or misrepresentation as to the value of the AWH Exchange and therefore is void *ab initio*. Whether such a defense would be successful or meritorious is beyond the scope of this Initial Report.

There are a number of other smaller convertible notes that remain outstanding as set forth in the Q2 Report. For the same reasons as set forth above, the Temporary Receiver has not seen any evidence that NSAV is capable of paying any such notes if and when they come due, and believes that the issuance new shares of NSAV presents substantial securities fraud risk.

### C.    Quick Capital Judgment

Quick Capital has sought specific performance on its judgment, for the issuance of shares in NSAV, and its counsel has advised the Temporary Receiver that it wants the shares. Indeed, Quick Capital has pointed to an injunction stating that any new shares in NSAV must be issued to it in the first instance, as opposed to being sold to fund operations. In any event, the Temporary Receiver does not believe that any new shares should be issued at this time for the reasons set forth in this Initial Report.

### D.    Grover Judgment

The Grover Judgment remaining in this case remains outstanding, although the Company and Tilton have, through counsel, moved to reconsider and vacate that judgment. The Temporary Receiver notes that the $64 million value of the Grover Judgment was based on the high price of the stock, which was only achieved as a result of one of the Silverbear deals and excitement on the possibility of a new cryptocurrency exchange, none of which came to fruition and may have been the result of misconduct not attributable to Grover. Whether NSAV has meritorious defenses is

beyond the scope of this Initial Report.[9]  Nevertheless, even if NSAV could challenge or reduce the amount of the Grover Judgment, the Temporary Receiver's preliminary analysis, as set forth in this Initial Report, indicates no ability to pay a judgment of any material size.

### E.      Capital Table and Stockholders Equity, and TG Private Equity Note

NSAV has a number of Preferred A and Preferred B Shares, as set forth in the Q2 Report. Many of those shares appear to have been issued in connection with the Silverbear deals that did not result in any value for NSAV.  In addition, the Q2 Report lists a $59 million dollar note as against TG Private Equity, although the documentation around that note remains unclear.  In any event, it is possible that the TG Private Equity note, and the interests awarded to Silverbear, especially in the form of Preferred A and B Shares, might be void or voidable as a result of litigation against Silverbear, TG Private Equity, or related persons.  Whether such litigation would be successful is beyond the scope of this Initial Report.

### F.      Solvency of NSAV

Based on the Temporary Receiver's preliminary analysis of NSAV's financials, there do not appear to be any productive assets in NSAV to generate sufficient cash flow to meet any of NSAV's operational or legal liabilities—regardless whether the Grover Judgment is valued at $64 million or some much lower number.  None of NSAV's purported assets appear to have any value, let alone their stated value, or any sufficiently reliable value to pledge as collateral for financing to satisfy liabilities and operational expenses.  Therefore, based solely on the preliminary analysis

---

[9] This Initial Report is limited to the matters discussed herein and not any financial or securities issues that may arise from entities that are also connected to any or all of Grover, Tilton, Knoll, Osborn, Silverbear, or related parties.  Any such issues are beyond the scope of this report.  Nevertheless, to the extent that the issues raised in this Initial Report may bear on broader issues and related entities, the Temporary Receiver will, out of an abundance of caution, send a copy of this Initial Report to the Securities and Exchange Commission.

of the Temporary Receiver, it appears that NSAV is insolvent on both a cash flow basis and on a balance sheet basis.

## VI.    RECOMMENDATIONS AND NEXT STEPS

As set forth above, the Temporary Receiver's preliminary analysis reveals that NSAV does not have any material assets that could be used to satisfy the Grover Judgment. The only access to working capital or any kind that NSAV appears to have is the sale of shares on the OTC Markets. However, because the Q2 Report does not reflect the accurate financial condition of NSAV— based on the Temporary Receiver's preliminary analysis—the Temporary Receiver respectfully submits that the issuance of new shares bears too high a risk of noncompliance with the securities laws for him to authorize such issuance. Given the severity of the gap between the Q2 Report and the Temporary Receiver's view of the actual financial condition, it is not clear that any restatement of the financial reports would be reasonably possible.

Given that NSAV appears to be, based on the preliminary review of the Temporary Receiver, deeply insolvent without any ability to satisfy the Grover Judgment and with significant concerns about the raising of capital via the public markets, NSAV and its stakeholders may benefit from filing for protection under Chapter 7 of the Bankruptcy Code. A Chapter 7 bankruptcy will preserve the Grover Judgment as an unsecured debt of putative bankruptcy estate, and will protect NSAV shareholders and other stakeholders by allowing for an orderly wind down of NSAV's affairs consistent with the Bankruptcy Code and federal securities laws. The potential NSAV causes of action against Silverbear (if meritorious and economical) will also pass into the estate and could be brought if a court-appointed Chapter 7 trustee determined to do so. Filing for Chapter 7 liquidation is not, in the view of the Temporary Receiver, within the scope of his powers under

the Receivership Order and would require further Order of the Court—subject as well to the views of the Parties—to so authorize such a filing.

Otherwise, there are not sufficient assets in NSAV to continue to fund a receivership. The Temporary Receiver and his team will prepare a fee application to file with the Court, with the understanding that any approved fees and expenses will likely be an unsecured debt of NSAV. In the event that the Court authorizes the Temporary Receiver to file Chapter 7 on behalf of NSAV, the Temporary Receiver will remain available to hand over all documents collected to the court-appointed Chapter 7 Trustee (who will also have the benefit of this Initial Report).

In the interest of full disclosure to the markets, the Temporary Receiver will also serve a copy of this Initial Report on OTC Markets and on Pacific, although what OTC Markets and Pacific do with the Initial Report are beyond the scope of the Temporary Receiver's powers and duties. The Temporary Receiver will also serve this Initial Report on the Securities and Exchange Commission, and will be available to provide the Court with any additional information.

Dated: New York, New York
October 31, 2024

Respectfully Submitted,

By: */s/ David A. Castleman*
David A. Castleman
Philip C. Berg
Varinder P. Singh
OTTERBOURG P.C.
230 Park Avenue
New York, New York 10169
Tel.: (212) 661-9100
dcastleman@otterbourg.com

*Temporary Receiver*

**Appendix: Documents Provided to the Temporary Receiver**

- o NSAV General Ledger – 2023 to 2024
- o NSAV OTC Q2 2024 Financial Statements
- o NSAV OTC Company Information and Disclosure Statement 6/30/24 Quarterly report
- o NSAV Cryptocurrency Reconciliation Q2 2024
- o Copy of default judgment and injunction from Quick Capital (Florida case)
- o NSAV's responses to Questions from OTC Surveillance
- o Detailed Holder List from Pacific Stock Transfer Company
- o Countersigned Yuen Wong- NSAV Director Hiring Agreement
- o Docusigned NSAV Preferred B Issuance Resolution to Yuen Wong
- o Countersigned Danny Lau Director- NSAV Board Hiring Agreement
- o Signed NSAV Preferred B Issuance Resolution to Man Kin Lau
- o Partially signed (NSAV only) Mr. Dato Sri Desmond Lim-NSAV Officer Hiring Agreement
- o Docusigned NSAV Preferred B Issuance Resolution to Dato Sri Desmond Lim
- o Countersigned Mr. Tsz Chun Ma- NSAV Hiring Agreement
- o Docusigned NSAV Preferred B Issuance Resolution to Ma Tsz Chun
- o Countersigned Mr. Stanley Yu-NSAV Officer Hiring Agreement
- o Passport of Yeung Tze Ling
- o NSAV SEC Form 8-K Virtualbroker Acquisition
- o Alfonso Knoll Deposition Transcript
- o NSAV $2.5M Promissory Note to Active World Holdings
- o Cancellation of Sale of Exchange from AWH to NSAV
- o AWC Overview-AWH Deliverables
- o AWH Tech Outline
- o AWC NSAV Share Exchange Agreement and 1st Amendment to Agreement
- o Attachments from James Tilton regarding NSAV CEX announcements by Peter Chun
- o NSAV Tax Returns from 2009-2017
- o Countersigned NSAV- Danyi Zhang VSRI Acquisition Agreement and Amended Agreement
- o Countersigned NSAV Zhang VSRI Promissory Note
- o Tilton's Response to Temporary Receiver's First set of Questions
- o Fully Signed NSAV-TG Private Equity NSAV Exchange CEX Agreement
- o First Image of NSAV CEX from Peter Chun email
- o Press Release regarding NSAV announcement of plan to launch cryptocurrency exchange and announcement by NSAV that it is on track to meet August 9, 2021 launch date. Press release announcing NSAV's Crypto Exchange with the caveat that the exchange is not fully operational.
- o Countersigned SBC Token Agreement NSAV-TG Private Equity
- o Docusigned NSAV Preferred B Issuance Resolution to TG Private Equity SBCDF Investment
- o NSAV press release announcing major stake in SBCDF Investment and STUX Token in $15M transaction.
- o  Cancellation of NSAV Stock Certificates sent to TG Private Equity
- o Signed NSAV B Share Issuance Resolution
- o Press Release: NSAV Announces Partnership with Himalaya Technologies.

- o Press release by NSAV announcing formation of NSAVx.com in Puerto Rico and Application for Puerto Rico Money Transmitter License.
- o Press Release by NSAV announcing TheAlley.io Update and Highlights
- o Press Release from Himalaya Technologies providing EVEREST Token Update.
- o NSAV Authorization for HMLA Press Release
- o Metaverse Network LLC Open corporates Screenshot
- o Screenshot of Red Bridge Website indicating AWALLET Next Level was acquired by NSAV
- o A screenshot from Tilton of someone alleged to be Peter Chen from Red Bridge's website.
- o Press Release announcing NSAV's acquisition of stake in BQEX Crypto Exchange
- o Countersigned NSAV-TG Private Equity BQEX Agreement
- o Videos from Tilton appearing to show collaboration between NSAV, HIVE, and BQEX
- o NSAV Announces BQEX Crypto Exchange Acquisition of VAEX Press Release
- o Fully Signed NSAV HIVE Agreement
- o Fully Signed NSAV TG Private Equity HIVE Mobile Mining Agreement
- o Screenshots of HIVE CODES Website
- o Press Release- NSAV Signs Definitive Agreement to Acquire a 50% Stake in Hive Crypto Mining Operation
- o Press Release- NSAV Announces Launch of HIVE
- o HIVE CODES Inc Dormant Accounts 9/30/23
- o MNC-HIVE Videos and Photos sent to Tilton by Peter Chun and/or Maggie Mak of Silverbear